TISHOMINGO SAVINGS INSTITUTION *v.* O. C. CARR et al.

TISHOMINGO SAVINGS INSTITUTION *v.* H. J. DUKE.

Foreclosure Sale — Rights of Creditors — Constructive Notice.

It is not incumbent on the truste in a trust deed or the holder of notes secured thereby to give special notice to a judgment creditor whose lien is subordinate. When a foreclosure sale has been advertised as provided by the terms of the instrument under which the sale is made, and in accordance with the statutory provisions on the subject, all creditors are charged with constructive notice.[1]

Devise of Land — Failure of Title — Executor's Liability.

A devisee under a will has no claim against the executor for a failure of title to lands which he had received from the testator. And the admission of such an indebtedness by the executor and an assumption to pay such claims will not operate as a claim against the estate of the executor as against creditors.[2]

Mortgaged Personalty — Sale by Executor and Application of Proceeds — Rights of Judgment Creditors.

An executor of an insolvent estate has no right to divert the proceeds of mortgaged personalty to the payment of unsecured debts, leaving the mortgage to operate on the lands to the exclusion of a judgment creditor, whose lien is subordinate to that of the mortgage.

Rents from Mortgaged Property — Application of.

Rents from mortgaged property of an insolvent estate cannot be partitioned among residuary legatees to the exclusion of creditors of the estate.

---

1

As to notice of sale under a trust deed the instrument must control, and compliance therewith is all that the law demands. Johns *v.* Sergeant, 45 Miss. 332.

A trustee in a mortgage with power of sale, on default in the payment of the debt, may execute the power without the intervention of a court of equity, and a sale made by him, in accordance with the terms of the mortgage, is a

Points of Counsel.

Suit by H. J. Duke against the Tishomingo Savings Institution to enjoin an execution sale to satisfy a judgment. From a decree perpetuating the injunction this appeal is prosecuted. Reversed.

APPEALED from Chancery Court, Pontotoc county, A. B. FLY, Chancellor.

Reversed and remanded, January 24, 1887. Affirmed in part.

*Attorneys for appellant, T. D. Young and J. M. Boone.*

*Attorneys for appellee, Fontain & Mitchell and James H. Barr.*

Brief of Young & Boone:

As the two above-styled causes were heard and determined together by the court below, and are intimately blended in points of law and fact, it is thought better to likewise submit them here.

Appellant respectfully insists that the following language contained in the said McCaw trust deed under which a part of the lands in question were sold, viz.: "And if said sums of money shall not be paid at the maturity thereof or thereafter when called for, then the said James H. Barr shall sell  *   *   *" made it absolutely essential to a valid sale of said lands under said trust deed, the said sums not having been paid at the maturity thereof, that a call or demand for the payment of said sum should be made on the payor, or his legal representatives, prior to the advertisement and sale of said lands under the said trust deed; for otherwise there could have been no default sufficient to warrant such sale. Indeed, it is so charged in the answer and cross-bill of appellant, and not denied by Mitchell or Carr, appellees, or either of them. And, therefore, to that extent should have been taken by the court below as confessed. See Code 1880, page 521, § 1892. " No title

perfect foreclosure and a bar to the equity of redemption. Sims *v.* Hundley, 2 How. 896.

2

·An administrator selling land under an order of the Probate Court is not bound to warrant the title. Campbell *v.* Brown, 6 How. 106.

He sells the title as it exists. If he were to make a warranty it would probably bind himself only. Miller *v.* Boarman, 13 S. & M. 100.

passes by a sale under a power contained in a mortgage unless the conditions thereof are strictly complied with." Smith v. Brown et al., 4 Allen (Mass.), 516; Hall v. Towell, 45 Ill. 493; Wade v. Thompson, 52 Miss. 367; 13 S. & M. 763.

It is insisted that in order to a valid sale under the terms and provisions of the trust deed under which said Huntington made a pretended sale of some of the lands in controversy, owing to the following language therein contained, to wit: " If the said party of the first part shall fail * * * then the said party of the second part * * * may and shall enter into and take possession of said real and personal estate and sell the same."

It was vitally necessary for him to have actually entered and taken actual possession of said property before advertising and selling the same, but which he, the said Huntington, testifies he did not do. That in fact he had never seen any of it and did not even know it was advertised for sale till about the hour of sale, when he was, for the first time, advised of it by the said H. J. Duke. And the answer and cross-bill charges the fact which is not denied by appellees or either of them. Code 1880, § 1892; Smith v. Brown et al., 4 Allen (Mass.), 516; Hall v. Towell, 45 Ill. 493; 52 Miss. 367; 13 S. & M. 763.

That in order to protect the interest of appellant and the other creditors of said estate, which appellees in good conscience and fair dealings were bound to do, having assumed the management of the same as attorneys, agents, etc., of the said executor, in his absence, he being a nonresident of the State of Mississippi, it was essentially necessary, said estate also being insolvent, that the said trust deeds should have been foreclosed under a decree of the Chancery Court; especially as the answer and cross-bills of appellant charge that said property would have been sold for a great deal more money than it did, if said trust deeds had been regularly foreclosed through the Chancery Court, which is not denied by appellees in their answers thereto, and the only witness, Mr. Rogers, who was interrogated on the subject, said, in answer to cross-interrogatory, that " the title to all the Duke lands in his neighborhood were considered so doubtful and mixed that it was almost impossible to make a sale of them after his death," and farther on in rebuttal, that if a bill had been filed and the titles to the land cleared up they would have sold for a great deal more than they did sell for at said sales. Now, under such a state of

things, it seems to me, at least, considering all the circumstances surrounding these cases, that the court is bound, in the just administration of the law, to set aside said sales. And that too, on the above ground, independent of the other evidences of fraud in the premises. Perry on Trusts, § 602; Peck *v.* Peck, 9 Yerg. 304; 2 Story's Equity, § 1276, note 1; Myers *v.* Lee, 2 Lea (Tenn.), 159.

While appellant urges the inadequacy of the price paid for said lands by appellees at said sales, as shown by the evidence in the cases, was quite sufficient to have warranted the courts below in rendering decrees setting the same aside, appellant respectfully insists that it was not necessary, under the law and the fact involved, but only requisite for it to establish to the satisfaction of the court, that (situated as all the parties were, taking into consideration the relationship of all the parties to each other and to the estate of said decedents, and the rights and condition of appellants with its judgment against said decedents, which was a lien on his property, yet not having the power, owing to the peculiar statute of the State, to proceed under its special execution to make its money, by selling the equity of redemption in said property, till after the expiration of twelve months from the death of said decedent, which had not elapsed when said sales in question were made), appellees sought and obtained an unconscionable advantage of it in the sale and purchase of said property, and that it sold for less than its value under said trust deed, which they did; because the proof shows they purchased the McCraw trust deed for the sole purpose of speculation. And if they wanted no advantage and sought none of appellant, why this purchase of the McCraw trust deed and sale thereunder by the very party who had been requested to advise appellant, within two days before its purchase, if he should know of any steps taken by any one to sell thereunder (in order that it might protect itself), and didn't do it. Certainly this discloses such a fraud upon the rights of appellants and the other creditors of said estate as will not be tolerated by a court of equity, even if there were no other question of fraud and wrongdoing involved.

The entire manner and conduct of the appellees in reference to the management of the effects of said estate unmistakably revealed their reckless and most outrageous disregard of the interest of the appellant and the other creditors therein, and they should be

called to account for their sins and disgorge their ill-gotten gains.

As to special executions, see Code 1880, § 1751.

It is further insisted by appellant that the three several deeds of trust pretended to have been given by the said H. Duke, deceased, for the benefit of the said appellee, H. J. Duke, are fraudulent and void, both in law and in fact, because they were given in three successive years on the three successive crops, besides a large amount of other property, all that was available in the process of the law, at a time when H. J. Duke knew of the total insolvency of the said decedent for the same pretended debts, as appeared from the testimony of the said H. J. Duke, but without disclosing the fact in the face of said trust deed, except the second one, thus concealing the real transaction, if there was any real transaction involved, from the creditors of the said decedent, by pretending that the said decedent was in fact indebted to him in the sum of $5,000 or $6,000 in the aggregate, whereas he states, in his deposition, that he in fact only owed him about $2,200, for a part of which amount he was surety on note of said decedent to appellee Mitchell, and the other was agreed to be paid him in consideration of the failure of the title to some land which he, the said H. J. Duke, inherited from the estate of his father and was deeded to him in the division of said estate between the heirs thereto, which made it a voluntary consideration, as between him and the said decedent, and consequently not sufficient to uphold the trust deeds aforesaid, as against appellant. And the court will observe that the considerations mentioned for said trust deeds were not at all disclosed thereby, and, not being disclosed, amount to fraud as tending to hinder and delay appellants and the other creditors of said decedent in the collection of their debt and besides said trust deeds provide that in case of a sale thereunder and there is any surplus after the payment of said pretended debts, the same shall be paid to said decedent, notwithstanding he was insolvent at the time of their execution.

That there was intentional fraud on the part of the said Dukes from the beginning to the end in reference to possessing themselves of the property and effects of said estate there can be no doubt, in any reasonable mind, as all conversant with human conduct and human affairs, that will take the trouble to investigate the facts developed in the record in the cases pertaining thereto, can see.

And the failure of the appellees Carr and Mitchell to testify as witnesses in their behalf and to introduce the executor B. F. Duke and the trustee J. H. Barr, important witnesses in the premises, in explanation of the innumerable badges of fraud clustering so thickly around the transactions in question, especially when considered in the light of the relationship existing between all parties, warranted the court in *conclusively presuming* that said appellees, Mitchell and Carr, knew of the fraudulent purpose of the said Dukes in the premises, or had the utmost good reasons to suspect and believe the same.

In fact it is charged in the answer and cross-bills of the appellant, and not denied by appellees or either of them, that the sale under the trust deeds by Huntington was made at a time when the said H. J. Duke knew said C. B. Mitchell would be absent and was absent, in order to prevent him, the said Mitchell, from bidding against him for a certain piece of land which was sold at said sale, and purchased by him for about $100, and which he thereafter sold to the said Mitchell for $300, or thereabout, which brought home to appellees Carr and Mitchell the actual knowledge of the evil intentions and purpose of the said Dukes to defraud the estate aforesaid, and the creditors thereof. Then again, the said appellee Mitchell is shown to have been the attorney of the said Dukes and to have been consulted and advised with in regard to the propriety of purchasing the McCaw trust deed and having the lands sold thereunder, and certainly he knew the object in so doing was to speculate upon the property and effects belonging to said estate, because H. J. Duke testifies that such was the purpose that actuated him therein and that he consulted with Mitchell and Fontain and Barr before doing so, etc., and that appellees purchased the land in controversy at the sale under said McCaw trust deed, notably the Long Branch place for about $900, which yielded for the year 1883 $400 in rents, of which Mitchell received $300, and very generously gave to the said H. J. Duke the other $100, " as he was coming out rather badly." The court will observe, from the record and proof in said cases, that the said sale of said lands under said McCaw trust deed in the month of June, 1883, after the said H. J. Duke as the agent of his brother B. F. Duke, the executor, etc., had rented the lands out for the year and after the sale that the crops then growing upon said lands were cultivated and harvested with the horses and mules and farming implements belonging to the said estate, and that no account thereof was made

whatever. Will the courts of the country uphold any such conduct and fail to denounce it as a fraud? I trust not.

We first find the said H. J. Duke, according to the proof in the cases, renting out the lands belonging to the said estate, collecting the rents, paying taxes, buying and selling oxen and wagons for and on behalf of said estate as the pretended agent of the executor thereof, B. F. Duke, rendering no account of anything, then making a sale through the trustee, Huntington, at an unusual time of the year and after he, as agent of the said executor, rented them out for the year, a long list of lands belonging to said estate, all of which he purchased for about $300, and immediately sold three of the pieces for $850, with no one to bid against him but appellee Carr, who very kindly permitted him, the said H. J. Duke, to take his bids off his hands at a profit of $40 or $50, the price possibly of his failure to get the trustee to make the sale while the said Carr was off at dinner. Next we find him within two days after a reasonable request made of him by counsel for appellant, " that if he knew of any steps being taken to close out the said McCaw trust to let him or appellant know of it, in order that the latter's interest might be protected by having some one at such sale to buy the property, or made it bring its value," and after consultation had with all the parties interested, going about twenty miles away to purchase the same and having it closed out without giving any notice thereof whatever to either appellant or its counsel, even requesting N. M. Hay from whom he made his purchase not to inform them, or rather saying to him that he did not want his business in that connection " heralded." In consequence of which the said Hay, although likewise requested by counsel of appellant to give the like notice for the like reason assigned to the said Duke, failed to give them the required information, as his testimony shows. And, although the said Duke testifies that he purchased the said McCaw trust deed on speculation, and it is pretended that appellees Carr and Mitchell had no interest therein and knew nothing of, and did not suspect any fraudulent design, the said Duke had in purchasing said trust deed, and purchased their part of the property in controversy on their own hook, and in no wise for the benefit and participation therein of the said Duke, it appears that the said Duke stood by and allowed all of the property to be sold, and the most valuable pieces thereof to be bid in by the said Mitchell and Carr at a sum, to say the least of it, far below its value, conveying rents and all for the year, leav-

ing a balance due him on said trust deed of about $1,500, with no hope of ever getting one cent of it out of said estate; for that, he testifies, was hopelessly insolvent. He even says he borrowed a large portion of the money with which he purchased the said trust deed, and then stood by and let all the lands be sold in twenty-five days thereafter, and lost $1,000 or $1,500, when he would have had nothing to do but to have purchased the lands, or have made them bring the amount of the trust deed in order to have fully protected himself.

The Long Branch place, he was informed by N. W. McWhorter, one of the witnesses, before he purchased the trust deed, was worth $4,000 or $5,000 itself. This he allowed Mitchell and Carr to buy in for $900, including the year's rent, $400, and he, as agent of the executor of said estate, in addition thereto, gave the use of the horses and mules and farming implements to cultivate and harvest the crops grown thereon the balance of the year. It seems to me that this transaction alone is sufficient to call appellees Carr and Mitchell to the witness stand in explanation of the whole matter, and that they only failed therein because they could not " stand muster." Then, again, we find the Dukes, after advising with their counsel, notwithstanding that not one dollar of the indebtedness of said estate had been paid, and notwithstanding prior legatees had not received one cent, dividing the proceeds of five bales of cotton, belonging to said estate, between themselves as residuary legatees under the will of said decedent. And when the following question is put to the said H. J. Duke in reference to the matter, to wit: " Have you kept an account between you and B. F. Duke of all the proceeds of H. Duke's estate with reference to an equal division of the same between you as residuary legatees under his will on a future final settlement to be had between you?" he evasively answered: " This cotton is the only division we have ever had." And when the same question in substance is repeated to him, he again evasively replies: " I should say that we have never had any settlement of these matters except with reference to the five bales of cotton, not farther than the accounts show that he has paid me on them." All showing very clearly that they in the outset commenced to enrich themselves and divide out between them the whole effects of said estate, regardless of the rights of appellant and the other creditors and legatees, and they have accomplished it.

Then again they shipped the cotton, about sixty bales, to New

Orleans and sold it instead of closing it out under the trust deed
as they should. And how much it brought they failed to show,
except $45 or $50 per bale, and the amount which was paid to
him, the said H. J. Duke, and of the proceeds of said cotton,
$2,350, was misappropriated by him to the payments of the ac-
counts on his books made by the tenants, under an arrangement
with the said executor, who cultivated said lands, instead of to the
payment of said pretended trust deed under which said sale was
made by the said Huntington, as trustee, as aforesaid, and which
sum, if it had been paid and credited on said trust deed, would
have satisfied the same, admitting there was a good consideration
for the notes therein described, which appellant does not do.
And why will fully appear on examination of the deposition of
the said H. J. Duke in reference to the same. And, therefore,
said sale should be held void.

Then, too, no account of the effects of the said estate has ever
been rendered to the court, no inventory thereof filed, and no au-
thority from the court procured to carry on and cultivate the crops
on said lands of said decedent, or for anything else that has been
done in connection with the management and disposition of the
same, and no bond given or required of said executor.

It is further insisted that if the court concludes that the fraud
of appellees, or any of them, has been sufficiently established to
warrant the setting aside of the sale of said lands, or any of them,
or any part thereof; that they should be denied the right to have
anything reimbursed them, or to in any way participate in the
proceeds arising from a sale of said lands, at least till after the
payment and satisfaction of the judgment of appellants. McLean
v. Litchford, 60 Miss. 169; Hardy v. Thomas, 1 Cush. 544.

And it is further insisted the deposition of John H. Crawford
should have been excluded by the court.

The date of the enrollment of judgments, shown by the record,
cannot be impeached by the clerk. It imports absolute verity.
Murrah v. State, 51 Miss. 652, and authorities cited.

Brief of Fontain & Mitchell:

There was no error in the decree of the court below in perpetu-
ating the injunction granted appellee in this cause. It was un-
necessary for the court to have passed upon the exceptions to the
deposition of Crawford, and the bill of exceptions shows the

chancellor did not pass upon the exceptions to said deposition, there being ample evidence for the decree as rendered without this or this evidence. Yet we say this evidence was competent to explain, in this cause, the two enrollments of said judgment; while an officer cannot impeach his official act (Stone *v.* Montgomery & Wife, 38 Miss. 83), such acts are the subject of explanation by him. Shotwell *v.* Hamblin, 23 Miss. 156; La Piece *v.* Hughes, 24 Miss. 69.

There purports to be two different enrollments of this judgment in two different books, purporting to have been done on the same day, one of them pursuant to the form and requirements of the Acts of 1878 (page 191), which act was repealed previous to the rendition of this judgment, and was, therefore, we contend, no enrollment at all, and constituted no judgment lien. The other enrollment was pursuant to the form and requirements of Code 1880, the law in force in relation to the enrollment of judgments at date of rendition of judgment, and has never been repealed or amended. See Code 1880, § 1736.

The witness does not pretend to deny that he enrolled the judgment (and cannot do so), but it is utterly impossible that he could have enrolled the judgment in both books at the same time, and it is certainly competent for him to say which enrollment was first made by him and is no contradiction of his official act of enrollment. Yet if the testimony in relation to said enrollment of said judgment is or should be held incompetent the mere fact that the chancellor did not pass upon the exceptions thereto cannot warrant a reversal of the decree. The chancellor decided the cause upon the facts, and such decision is analogous to the verdict of a jury, and must be shown to be erroneous by being opposed to the weight or preponderance of testimony. Apple *v.* Ganong, 47 Miss. 196; Partee *v.* Bedford, 51 Miss. 84; 11 S. & M. 455; 33 Miss. 433. And the party complaining must show that it was clearly wrong. Davis *v.* Richardson & May, 45 Miss. 510.

The decision of the chancellor being analogous to the verdict of the jury, and if the evidence of Crawford should be held to be incompetent, and should have been admitted as competent (much less the omission to pass upon the exceptions to it), could not have the effect to set aside the decree, first, because justice has been done and there is little prospect of a different result on another trial. Barringer *v.* Nesbit, 1 S. & M. 22; McMullen *v.* Mayo, 8 S. & M. 298. Second. It could have had no influence on this decree.

Pritchard *v.* Mayes, 3 S. & M. 42. And third, because the decree is otherwise sufficiently proven by other and competent evidence. Fore *v.* Williams, 35 Miss. 533; Hand *v.* Grant, 5 S. & M. 508.

There is nothing in the fourth assignment of error; the bill alleges and the proof shows as to the land purchased under Mc-Caw deed of trust both a demand from Henry Duke, the grantor in said deed in trust, during his lifetime, and of his executor since his death, before Barr, the trustee, made the sale. Nor was it necessary that Huntington, the trustee, should have taken possession of the lands before he could have sold the same. After breach of condition the possession of the land became vested in the trustee (Huntington) by the deed in trust, the right of the grantor to the possession then ceased, and there could be no adverse holding by him as against his deed, nor was there any objection to said sale either before or at the time, for this or any other cause. The trustee's deed conveyed the title to said land to the purchaser, whether he took possession of the land or not (the title to land passing by deed and not by delivery of possession), and any one having an interest in or claim to land may sell the same, notwithstanding the possession may be held (even adversely) by a third person. Cassedy *v.* Jackson, 45 Miss. 397.

Therefore if Huntington, the trustee, should have taken possession of the land before sale, it was only because the deed in trust required it. But we say that this is a personal privilege, and none but the grantor or his representatives could require that the trustee should take possession. Appellant cannot complain. Wade *v.* Thompson, 52 Miss. 367; Wightman *v.* Reynolds, 24 Miss. 681.

Nor can the trustee impeach his deed. Walker *v.* Brungard, 13 S. & M. 760.

The case of Roarty *v.* Mitchell, 7 Gray, 243, relied on by appellant in the court below, was a contest between the grantor in the deed of trust, and the purchaser at the trustee's sale.

The fifth assignment is equally untenable. It was not necessary, or at all essential, that resort should be had to the Chancery Court to foreclose the deed in trust. The trustee may sell under the power after the death of the grantor in deed. Perry on Trusts (3d ed.), § 602; Hyde *v.* Warren, 44 Miss. 13.

Nor was it essential that the claim should have been probated. The failure to probate could not have the effect of barring the right to enforce lien against the property conveyed in the deed in trust. Code 1880, § 2031.

The court could not have held that the several trust deeds were frauds in law or in fact; they were neither. The charge of fraud is that H. Duke owed H. J. Duke nothing. The proof taken to establish this charge shows positively that he was indebted to H. J. Duke in a large amount, and owing him, he, H. Duke, had the legal right to prefer him, and to do this executed the deeds in trust, and although, at the date of the execution of the deeds of trust, appellant's suit was pending, and would shortly have ripened into judgment, and that the Dukes were related, being second or third cousins, the only way in which appellant could vacate the deeds is to show the security was a sham, never to be enforced, that the debts secured are simulated, or that some benefit is reserved to the grantor. Surget et al. *v.* Boyd, 57 Miss. 485.

Nothing of which the appellant has done but has wholly and entirely failed. Nor was there any fraud in the purchase of the McCaw deed in trust by H. J. Duke, or in the sale thereunder. The only charge of facts in relation to this purchase of the debt secured by this deed of trust that would constitute a fraud in the cross-bill is that H. J. Duke paid for the debt with money belonging to Henry Duke's estate. This the testimony clearly and positively disproves, and the charge stands unsupported by any evidence whatever in the cause. Fraud cannot be presumed; it must be proven.

Appellee occupied no relation whatever to H. Duke's estate that prevented his purchasing the debt, and after purchasing, nothing to prevent his becoming a purchaser either at the trustee's sale, under this deed of trust, or under the deeds in trust executed by Henry Duke to secure his indebtedness to him. The *cestui que trust* may purchase at the trustee's sale. Perry on Trusts (3d ed.), § 602v and note 4; Walker *v.* Bungard, 13 S. & M. 766.

The sales under the different deeds in trust under which the lands were purchased by appellee in this cause were all fair ones. The notices of the sale made by Huntington, trustee, were posted up by appellee pursuant to the deed in trust, with Huntington's ratification and approval. The trustee may employ the *cestui que trust* as agent to effect a sale. Perry on Trusts, § 775.

None of the acts *in pais* which the trustees were required to perform are shown by the proof to have been omitted; they are, therefore, all presumed to have been done. Graham *v.* Fitts, 53 Miss. 307.

The land, as the proof shows, at said sales brought its full, or at

least its fair value, and we are unable to perceive how any fraud was perpetrated, or how the sales could be an unconscionable advantage over appellant. There could be no error in holding whether the judgment was a lien or not; it was junior to the liens created by the deeds in trust, which were executed and duly recorded long before the rendition or enrollment of the judgment.

It is, therefore, respectfully submitted that appellee is entitled to the relief sought, and that the relief granted in the court below is entirely consistent with the facts in his bill and fully proven, and that the decree of the court below ought to be affirmed by this court.

Brief of James H. Barr:

The questions involved in these cases are chiefly of facts. Whether the allegations of fraud have been sustained, or, as to the want of consideration in Duke's trust deed, have been proved, and whether the lands sold for such a grossly inadequate price as of itself would justify a setting aside of the sales, etc.

The first and second causes of error raise these questions on the sufficiency of the testimony, and I here assert confidently that there is not a single allegation of fraud in the cross-bill which has *any* testimony whatever to support it. Not only are they not supported by the testimony but they are wholly, abundantly, and circumstantially negatived. The same is the case as to the want of consideration for the deeds of trust under which the sales were made. Appellee establishes beyond cavil or suspicion the *bona fides* of each debt and shows the consideration of the notes and accounts by undisputed accounts taken from his mercantile books, entered, closed, and made in the lifetime of Henry Duke, and prior to any difficulty with creditors. The exhibits in connection with Duke's testimony demonstrate this beyond peradventure. The court will not reverse the decree of the chancellor on the facts, unless it be shown by appellant that the decree was clearly wrong and against the preponderance of the evidence. The presumptions are in favor of the correctness of the decree, and much the same rule governs as is applied to that of the verdict of the jury. Davis *v*. Richardson, 45 Miss. 500; Porter *v*. Bedford, 51 Miss. 84; Apple *v*. Ganong, 47 Miss. 189.

The case was decided by the chancellor, as expressly stated, without considering Crawford's testimony, and upon the hypoth-

esis that the judgment under which the levy was made had been duly enrolled during the lifetime of Henry Duke.

The testimony of H. J. Duke positively and unequivocally shows that demand for said money had been made of Henry Duke in his lifetime and repeatedly of B. F. Duke, his executor, after his death. And that N. M. Hay, Mrs. McCaw's agent, after time and again making demand, had written to myself to know whether I would act as trustee in selling said lands, and this testimony is undisputed. In addition to this, N. M. Hay, appellant's own witness, testifies that he made demand as agent for Mrs. McCaw, of Henry Duke in his lifetime, and of B. F. Duke and H. J. Duke, after Henry Duke died. There is not a. word of proof to the contrary. Even if a demand under the trust deed was a condition precedent to the right of trustee to sell, which we do not believe, yet this could only be invoked by the grantor in the trust, as it was intended for his protection alone, and cannot be urged as an objection to the sale by any one not a party to the deed of trust, and as to such parties is no cause for setting aside a sale. Wightman *v.* Reynolds, 24 Miss. 681; Wade *v.* Thompson et al., 52 Miss. 374; 2 Perry on Trusts (3d ed.), § 602dd.

The proof is so overwhelming on the question of inadequacy of price that the chancellor announced from the bench when he rendered his decision that the testimony not only failed to show an inadequacy of price, but on the contrary demonstrated that the land sold for more than it was worth, at least a greater portion of it did. The rule of law governing the setting aside sales for inadequacy of price is too familiar to the court to need citation of authorities.

The deed of trust to Mrs. McCaw, which it is alleged should have been foreclosed by Chancery Court, is the deliberate contract of the parties and the law by which the collection of the indebtedness therein secured should be collected, and there is no law that would require a *cestui que trust* to go to the expense of filing a bill in chancery to foreclose that which the parties to a contract had expressly said should be foreclosed in another way, to wit: by public sale by the trustee, and if there be circumstances under· which parties interested in or parties to a deed of trust can compel a foreclosure by bill in chancery, this rule or privilege only extends to such parties, and cannot be a cause for a third party to set aside a sale made in pursuance to the terms of the trust deed..

The record shows that appellee H. J. Duke testified at length, and exhaustively and minutely explained every transaction with which he was connected. Mitchell and Carr, in their answer to appellant's cross-bill, deny every allegation of fraud or badge of fraud charged against them, and that, too, in language so strong and unequivocal that there is no room for construction as to its meaning, and this answer is sworn to by them or one of them, and under the statute an answer sworn to is evidence and throws the burden of overcoming it on the opposing party. Again, that answer is sworn to by them, and in it every allegation of fraud is minutely denied and that, too, in the very strongest terms. What more could they do by testifying? By their answer they have certainly testified as strongly and clearly as they could possibly have done by deposition. If the appellee wanted to cross that testimony or wished explanations in regard to same, why did it not introduce them for that purpose as it did H. J. Duke? The appellees were present all the while, and were ready to testify at any time the appellant might see fit to call on them.

Appellant asserts that it should be a presumption against the appellee because they did not introduce James H. Barr as a witness. This is certainly asking the court to carry presumption to an extent hitherto unknown. J. H. Barr had nothing to do with the transactions in these cases excepting advancing the money to Henry Duke for Mrs. McCaw, and drawing up the trust to execute same, and then afterward selling the land as trustee in said trust deed. After the sale, and after every transaction which culminated into the title of H. J. Duke had transpired, then it was that he was retained as the counsel of H. J. Duke in these matters. No professional confidence sealed his lips in favor of Duke against the appellant — he was equally accessible to appellant as a witness as he was to H. J. Duke or to Mitchell and Carr. Besides, when the charge was made in cross-bill of appellant that J. H. Barr had been retained by Duke in order to prevent him from testifying, the charge is not only emphatically denied by H. J. Duke in his answer thereto, but in his answer he expressly tenders J. H. Barr to appellant as a witness with the privilege of examining him fully not only as to all within his knowledge prior to the sale and his retainer by Duke, but as to everything pertinent to the case that he had since learned as the special counsel of H. J. Duke. Yet in the teeth of these facts and when H. J. Duke's case stood intact before the court, and when the appellant had wholly failed to

establish a *single charge* of *fraud,* want of consideration, or inadequacy of price, this court is asked to construe it as a *conclusive presumption* of fraud against Duke, because, forsooth, he does not introduce a witness whom he does not need and whose testimony could only be accumulative on a point against which there is no testimony.    I have learned from the law-books that when a charge of fraud is made it must be proved or abandoned — but opposite counsel is reversing the rule and asking this court to hold that a charge of fraud carries with it the conclusive presumption of its truth and cannot even be overcome by uncontroverted proof to the contrary.

There is one point that was raised in the lower court and there relied on which is not referred to specially in the assignments of errors, and that is that the trustee, Huntington, had no power to sell under that trust because in the printed part of the trust it reads that he shall " enter into and take possession of said real and personal estate," etc., when in fact he did not enter into the possession of said land.    This point has already been considered, but, in addition, the proof shows that the lands sold by Huntington were all wild lands excepting two pieces, and they were not occupied by the debtor or his legal representatives, but if at all occupied they were occupied by a renter, and the proof does not show this only by inference.    Consequently the trustee could not have entered into the possession of said wild lands, and it would have been morally impossible for him to have *entered* into the possession of the two pieces which the proof shows had some cleared land upon them, and at the same time and for these reasons the requirements would fail and be of no effect.    Again, the cross-bill of appellant charges that B. F. Duke, the executor, had a full knowledge of all these sales, and if he did, and made no objection to them, then all irregularities are waived by him which he had a right to do, and it does not give the right to any one not a party to the trust to urge these irregularities, if they were irregularities, as a reason for setting aside such sale.    See authorities *supra,* 24 Miss. 681; 52 Miss. 374; 2 Perry on Trusts (3d ed.), § 602dd.

OPINION.— COOPER, C. J., delivered the opinion of the court:

The facts of the case, as far as they are necessary to be stated, are that one Henry Duke died in July, 1882, the owner of a large tract of real estate and of considerable personalty.    By his will,

he appointed one B. F. Duke executor, charged his whole estate with the payment of his debts, gave his executor plenary powers to sell any property necessary to be sold for the payment of debts, and after giving some lands to be selected by the executor to certain old family servants, made his executor and appellee H. J. Duke residuary legatees and devisees of the remainder of his estate.   The executor was relieved from the obligation of giving any bond; the estate was heavily in debt, was probably insolvent at the death of the testator, and is certainly now in that condition. On the 1st of August, 1881, the appellant obtained a judgment in the Circuit Court of Pontotoc county against the said H. Duke, which was enrolled on the 9th day of that month; some payments were made on this judgment in 1881, but there is a large balance due and unpaid.   After the expiration of more than a year from the death of the testator the appellee procured an order from the circuit judge of the district in which Pontotoc county is included, under which he sued out his execution and levied it upon the lands in controversy in this suit as it is provided may be done by section 751 of the Code of 1880.   The appellees thereupon exhibited this bill seeking to enjoin the sale under execution upon the ground that it would cast a cloud upon his title.

The title of complainant asserted in the bill is derived as follows: On the 12th day of May, A. D. 1881, Henry Duke executed a deed of trust to one Barr, trustee, to secure a debt of $2,800 to one Mrs. McCaw.   The complainant having purchased the note, secured thereby after the death of the maker, caused the land to be advertised and sold by the trustee and became the purchaser at such sale of a large part thereof.   As to the other parts of the land, the history of the title is this:   In 1880, Henry Duke borrowed from one Mitchell the sum of $1,500, for which he executed his promissory note with the complainant and B. F. Duke as sureties.   It appears also that Henry Duke had been executor to the will of the father of the complainant and as stated by complainant, who testifies as a witness, he as such executor conveyed to complainant certain lands which it was supposed was a part of that estate, but the title thereto having failed, the said Henry Duke undertook and promised to pay to the plaintiff the value of the same.   This supposed obligation, added to the amount of the Mitchell debt, made the sum of $2,350, and on the 20th day of September, 1880, Henry Duke executed his note for that sum payable to the com-

plainant, due May 1, 1882, and to secure the same executed a deed of trust upon his personal property, consisting of horses, mules, cattle, hogs, goats, etc. On the 11th day of July, 1881, to further secure complainant, because of his liability on the note to Mitchell and also to secure a note of that date for the sum of $707.96 (which was given for a balance of account due by Henry Duke to H. J. Duke), Henry Duke executed another deed of trust whereby he conveyed to one Huntington, trustee, certain other of the lands in controversy with power to sell the same upon default in the payment of the debts secured. The trustee, in May, 1883, proceeding under this deed, sold the lands thereby conveyed and at this sale the complainant became the purchaser of the greater part thereof; one Carr purchased some of the lands at this sale, but in consideration of the payment to him of about $50 transferred to complainant his bid and he received a title from the trustee. We may here state that in May, 1882, Henry Duke, to secure a debt of $286.43 and also to further secure the note of $2,350 of date September 20, 1880, executed another deed of trust to Huntington, trustee, whereby he conveyed all his crops of cotton to be grown during the year 1882 and also all cotton which should arise to him from the rents of his other lands. The complainant, stating thus his title to the lands, sought to enjoin the execution sale and for that purpose exhibited the original bill in this cause, on which an injunction was granted and served. The appellant, in response to this bill, filed its answer, which it made a cross-bill and attacked the validity of the sales under which complainant had purchased. The title derived under the sale made by Barr, trustee in the deed given to secure the debt to Mrs. McCaw, is assailed by the allegations that the complainant had possessed himself of the personal estate of the testator and realized therefrom the money by which payment was made in the purchase of the note from Mrs. McCaw. It is also charged that the sale was not fairly made, that the complainant had concealed from the defendant the fact that the sale had been advertised by the trustee for the purpose and with a view of bringing about the sale in the absence of the defendant's agent and attorney, in order that he might buy in the property at much less than its real value. That in fact this was done and the property sacrificed. The evidence in this branch of the case shows that a short time before the sale, one Young, the attorney of the appellant, applied to an agent

of Mrs. McCaw's who had the note due to her, for collection, and requested him to give notice to the bank if a sale should be advertised under that deed, and that the agent promised to comply with this request. It is also shown that at about the same time the attorney made the same request of the complainant, who made no response to the request. A few days after this the complainant purchased the note from Mrs. McCaw's agent, and in the conversation then had with him suggested that " he did not want his business affairs made public," or words to that effect. Soon after this purchase the sale was advertised by complainant and on the day fixed the trustee appeared and sold the lands. There is nothing in the record supporting the allegations of the bill that the funds of the testator were used by the complainant in making the purchase of the note from Mrs. McCaw. In the absence of such proof, we see nothing in the conduct of the complainant which invalidated the sale under this deed. He owed no duty to the defendant, who was a judgment creditor of the testator with a lien upon the lands subordinate to that of the trust deed. The defendant was not only charged with constructive notice of the contents of this deed, but seems to have actually known the powers thereby conferred upon the trustee. The debt secured was unquestionably due, the method for giving notice was expressly provided, and no creditor or other person interested was entitled to any other notice. The complainant had not agreed to give any information on the subject and though it may be true that he derived and expected to derive a benefit by the ignorance of the defendant of the day of sale we can see nothing in this nor in the fact that by reason of such ignorance he actually got the advantage of buying the property at less than its true value which should invalidate his purchase.

So far, therefore, as the decree sustains the purchase thus made it meets with our approval, is and will be affirmed.

We come now to a consideration of the facts disclosed in reference to the sale under the deed of July 11, 1881, in which Huntington was the trustee. It will be noted that in all the deeds of trust given to secure the various debts to H. J. Duke, the indebtedness to Mitchell of $1,500 was secured. It entered into the note of $2,350, given in September, 1880, and this note was again secured by the deed of May 12, 1882. Duke testifies that it was the $1,500 referred to in the deed of July, 1881, under which the land was sold. In addition to this debt, there was secured by the

deed of July 12, 1881, the further sum of $707.96 and by the deed of May 12, 1882, the further sum of $286.43, together with $750 for advances to be thereafter made to Henry Duke during the year 1882. The total indebtedness, exclusive of the sum to be advanced and of the sum which Henry Duke assumed to pay by reason of the failure of title of some lands which he as executor of H. J. Duke's father had set apart to H. J. Duke, was $2,694.39 and interest thereon. Adding interest to these debts to December, 1882, at which time the first payment was made to him by his executor, and assuming that the whole of the $750 contracted to be advanced had in fact been advanced, it will appear that the total amount due (exclusive of the obligation for the amount assumed for the failure of the land title) was about the sum of $3,900, and this sum is within $100 of the amount alleged to have been due by the answer to the cross-bill.

We are at a loss to determine upon what theory H. J. Duke asserted or Henry Duke admitted any liability on his part to account to H. J. Duke for a failure of title to lands which he had received from his father's estate. Certainly the promise to pay sum sum was *nudum pactum* and fixed no obligation on him to do so. We have, therefore, dismissed that sum from consideration. By the accounts rendered by H. J. Duke and filed as exhibits to his testimony and by his testimony it is shown that before the sale by Huntington, trustee, there had come to the hands of H. J. Duke from the proceeds of the mortgaged crops and personalty the sum of $3,641.61 and after the sale of the lands (in December, 1883) he received the further sum of $958 from a sale made under the deed of September, 1880, of personal estate thereby conveyed. In explanation of these payments the complainant testifies that a large part of these credits were applied to the payments of accounts created by the executor after the death of the testator and of debts due by tenants of the testator of which he or the executor had assumed payment. These appropriations should not have been made. It would be unjust to the defendant, a judgment creditor having a lien upon the lands of the testator subordinate to that given to the complainant by his deed of July, 1881, to permit the executor to divert the proceeds of the mortgaged personalty to the payment of unsecured debts, leaving the mortgage to operate on the lands to the exclusion of the subordinate lien.

The record is full of suggestions that this was an attempt by

the executor to favor his brother, the complainant, at the expense of other creditors. We find that the complainant having bought a part of the lands under one of the sales on which rents were due for the year 1883 divides the rents received with the executor, on the theory that he being a residuary legatee and devisee was entitled to such participation. That a nonresident executor of an insolvent estate acting under a will which relieved him from giving any bond can, by any such arrangement with a secured creditor, extend the security over the whole estate by agreeing to a misappropriation of the proceeds of the mortgaged property, cannot be tolerated. According to the showing made by the complainant, there was but little if anything due him at the date of the sale under the deed of trust of July, 1881. At that sale he became the purchaser of a large body of land, which a proper application of the payments made to him would have freed from liability to his claim under the deed and subjected to the judgment sought to be enjoined. It would be inequitable to permit him to enjoy the fruits of his own wrong to the exclusion of another creditor equally meritorious and having priority of right under the law.

The decree must, therefore, be reversed in so far as it dismisses the cross-bill in reference to the relief sought against the sale under the deed of July 11, 1881. That sale is vacated and annulled. The court below will direct a proper account to be stated, applying the credits derived from the mortgaged property to the payment of the debts secured by the several mortgages. The property will then be sold under the direction of the court. If anything remains due to complainant, he will be entitled to priority or satisfaction. The remainder must be applied to the judgment of the appellant. In taking this account, no allowance should be made for the sum ($850), agreed to be paid by Henry Duke for the failure of title of the lands which descended to the complainant from his father.

Decree *reversed.*